## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| TOUCH AMERICA HOLDINGS, INC., et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Case No. 03-11915 (KJC) |
| | ) | Jointly Administered |
| | ) | |
| BRENT WILLIAMS AS PLAN TRUSTEE FOR | ) | |
| TOUCH AMERICA HOLDINGS, INC. AND ITS | ) | |
| AFFILIATED DEBTOR ENTITIES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Proc. No. 14-50664 (KJC) |
| | ) | Adv. D.I. 215, 219, 221, 223, 236 |
| AT&T CORP., ZAYO GROUP, LLC AS | ) | |
| SUCCESSOR BY MERGER TO 360 NETWORKS | ) | |
| CORPORATION, AND SIERRA PACIFIC | ) | |
| POWER COMPANY AS SUCCESSOR TO | ) | |
| SIERRA PACIFIC COMMUNICATIONS, | ) | |
| | ) | |
| Defendants. | ) | |

### OPINION[1]

### BY:   KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

In 2003, Touch America Holdings, Inc. and its related entities (the "Debtors," the

"Company," or "TA") filed voluntary petitions under chapter 11 of the Bankruptcy Code,

liquidated its assets in three transactions, and then ceased operating. Among these transactions,

TA first conveyed a telecommunications conduit system—the "NexGen Assets"—to AT&T

---

[1] This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a). This is a core
proceeding pursuant to 28 U.S.C. 157(b)(1) and (b)(2)(O). Any capitalized terms not defined in this
Opinion shall have the definitions set forth in the Plan.

Corporation ("AT&T"). Second, and in connection with the NexGen sale, TA obtained certain NexGen Assets from Sierra Pacific Communications ("SPC"). Finally, TA sold its remaining assets to Zayo Group, LLC's ("Zayo") predecessor, 360Networks Corporation ("360").[2]

On September 3, 2014, more than ten years after the Company liquidated and ceased operating, the Trustee (defined herein) filed a complaint (the "Complaint") that initiated this adversary proceeding.[3] The Trustee attached a list of twenty-one (21) newly discovered[4] conduits to the Complaint.[5] Of these, the twenty-first conduit is no longer in dispute and has been withdrawn from the Complaint. The Trustee subsequently filed an Amended Complaint, and a Second Amended Complaint seeking a determination that the Trustee is the owner of twenty (20) conduits (the "Disputed Conduits").[6] The Disputed Conduits are in the ground and in underground river crossings, allegedly adjacent to portions of a conduit system (the "NexGen System") built pursuant to the Fiber Optic Agreement (defined herein) entered into by AT&T and TA in 1999. The Trustee further asks the Court to find that the Comprehensive Sale, Interpleader and Settlement Agreement (the "AT&T Settlement Agreement") entered into by the same parties over ten years ago did not effectuate a sale of the Disputed Conduits, thereby leaving them as part of the bankruptcy estate.

---

[2] This transaction was made pursuant to an asset purchase agreement ("360 APA"), which transferred the assets remaining after the first two transfers, except those assets specifically identified on an excluded asset list. Accordingly, the only assets left to the estate after the closing of the parties' agreements were those expressly listed as excluded.

[3] Adv. D.I. 1.

[4] Sometime in 2012, the Trustee received a telephone call from a party "looking to buy the residual assets in the estate." The Statement at ¶ 215. The call prompted the Trustee and his counsel to investigate the existence of residual assets. *Id.* at ¶ 216. The Trustee's investigation determined that the conduits were "adjacent" to the Links, and Exhibit A to the Complaint was titled "Adjacent Conduits."

[5] Trustee Complaint Ex. A.

[6] Adv. D.I. 21, 58. The Trustee's Amended Complaint named as defendants Zayo and Sierra Pacific Power Company ("SPPC"), the successor to SPC.

On June 25, 2015, Zayo and SPPC entered into an agreement whereby SPPC quitclaimed its interests in the Disputed Conduits to Zayo. Zayo now asserts any and all rights or claims SPPC held to the Disputed Conduits.

Before the Court are motions filed by three parties, each seeking to be declared owner of the Disputed Conduits: (i) Trustee's Motion for Partial Summary Judgment; (ii) Trustee's Motion for Partial Summary Judgment, or, in the Alternative, for Partial Summary Judgment, on Defendant AT&T's Counterclaim; (iii) Trustee's Motion for Summary Judgment; (iv) AT&T's Motion for Summary Judgment; and (v) Zayo's Motion for Summary Judgment. For the reasons stated herein, I will grant AT&T's Motion for Summary Judgment, and consequently, deny all other motions before me.

## UNDISPUTED FACTS[7]

Plaintiff Brent Williams, the trustee ("Trustee") of the liquidating trust created by the confirmed plan for the Debtors; Defendant AT&T; and Defendant Zayo, as successor-by-merger to 360 (collectively, the "Parties") submitted a statement of undisputed facts pursuant to the Court's instruction during the telephonic hearing on March 28, 2016. After considering each of the undisputed facts, I set forth below the facts that are relevant to my decision.

---

[7] The Court requested submission of a statement of agreed facts. The Debtors, together with the Trustee, AT&T, 360, and Zayo submitted the Parties' Joint Stipulation of Undisputed Facts, including the associated footnotes (the "Statement") (Adv. D.I. 291). The Statement was initially under seal, but at the request of the Court, the Parties have stipulated (Adv. D.I. 305) that the Statement can be unsealed. The completeness of the Statement and its helpfulness to the Court in contributing to this decision are most appreciated.

## PRIOR TO THE BANKRUPTCY

### The Fiber Optic Agreement

1.    On or about October 26, 1999, Touch America and AT&T entered into a contract entitled the Contract for the Supply of Fiber Optic Systems(s) and the Routes Upon Which the Systems are Constructed (the "Fiber Optic Agreement").[8]

2.    "The Fiber Optic Agreement [was] primarily a turn-key construction contract pursuant to which AT&T paid Touch America . . . to construct certain segments of AT&T's new nationwide 'NexGen' fiber optic network by constructing, installing and/or obtaining certain conduit, sites, fiber optic cable, rights of way, drawings and related network assets and rights along approximately 4,400 miles between certain city-pairs in the Western and Midwestern United States."[9]

3.    The Fiber Optic Agreement defined the term "System" as "[f]iber optic telecommunication facility comprised of the AT&T Conduit, the AT&T Fibers, the Builder Conduit, the Builder Fibers, the First Conduit, The Cable, the AT&T Sites and the Builder Sites which are, to be constructed pursuant to this Contract."[10]

4.    The Fiber Optic Agreement defined the term "Route" as "[s]elected path between AT&T Points of Presence ("POP") locations in Primary and Intermediate Cities, consisting of contiguous land and/or structures for which the rights to access, construct, install, upgrade, replace, operate and maintain the System have been secured."[11]

---

[8] Trustee's Appendix of Exhibits Filed Under Seal in support of Trustee's Motion for Summary Judgment (Adv. D.I. 233) at A0007-180 ("Fiber Optic Agreement" or "FOA").
[9] Archer Declaration Ex. 1 (Adv. D.I. 234) at 1 ("AT&T Settlement Agreement").
[10] Fiber Optic Agreement at § 2.42.
[11] *Id.* at § 2.34.

5.     The Fiber Optic Agreement defined the term "Points of Presence" or "POP" as "[a] terminal location where service is originated or terminated."[12]

6.     The Fiber Optic Agreement defined the term "Link" as "[t]he total of a Route and the System constructed on the Route."[13]

7.     The Fiber Optic Agreement defined the term "Conduit" as "[a] tube especially constructed for the purpose of placing and enclosing fiber optic cable."[14]

8.     The Fiber Optic Agreement defined the term "Builder Conduit" as "Conduits, not to exceed three (3) in number, which the Builder owns."[15]

9.     The Fiber Optic Agreement defined the term "AT&T Conduit" as "[t]wo (2) conduits which AT&T owns."[16]

10.     The Fiber Optic Agreement defined the term "First Conduit" as "[t]he first Conduit in which fiber is installed during the initial construction of the System which will contain The Cable."[17]

11.     The Fiber Optic Agreement defined the term "The Cable" as "[f]iber optic cable placed in the First Conduit which contains both AT&T Fibers and Builder Fibers. The sheathing and AT&T Fibers are owned by AT&T. The Builder Fibers are owned by Builder."[18]

12.     The Fiber Optic Agreement defined the term "AT&T Fibers" as "Fibers which AT&T owns."[19]

---

[12] *Id.* at § 2.30.
[13] *Id.* at § 2.25, Exhibits A and B to the FOA referenced throughout this Stipulation are not attached hereto.
[14] *Id.* at § 2.16.
[15] *Id.* at § 2.8.
[16] *Id.* at § 2.2.
[17] *Id.* at § 2.22.
[18] *Id.* at § 2.43.
[19] *Id.* at § 2.3.

13.   The Fiber Optic Agreement defined the term "Builder Fibers" as "Fibers which Builder owns."[20]

14.   The Fiber Optic Agreement specified construction of Links between Seattle, WA, and Billings, MT ("Link 16"); Minneapolis, MN, and Chicago, IL ("Link 17"); St. Louis, MO, and Plano, IL, ("Link 21"); Sacramento, CA, and Salt Lake City, UT, ("Link 22"); Salt Lake City, UT, and Denver, CO, ("Link 23"); and Denver, CO, and Chicago, IL ("Link 24").[21]

15.   Exhibit B to the Fiber Optic Agreement is entitled "Exhibit B: Rates, Pricing, Fiber Counts, Schedule" and includes descriptions of the planned build for Links 16, 17, 21, 22, 23 and 24.[22]

16.   Exhibit B to the Fiber Optic Agreement lists, among other things, the number of conduits, size of the outer diameter of the conduit, color and type of conduit Touch America was to build for each of Links 16, 17, 21, 22, 23 and 24.[23]

17.   Section 4.4.L of the Fiber Optic Agreement states that "[i]f the Builder . . . elects to place more than three (3) Builder Conduits in AT&T private [right of way], the [right of way] price will be negotiated."[24]

18.   Section 4.5.I of the Fiber Optic Agreement states that:

> Builder shall notify AT&T of any changes in Builder Conduit requirements from those designated in Exhibit B prior to construction. This would include Conduits required by permitting agencies. If Builder requires more than three (3) Conduits in any portion of a Link, AT&T and Builder will agree in writing on any terms or charges to Builder, if any for additional Builder Conduit on AT&T private ROW.[25]

---

[20] *Id.* at § 2.9.
[21] *Id.* at Exs. A & B.
[22] *Id.* at Ex. B.
[23] *Id.*
[24] *Id.* at § 4.4.L.
[25] *Id.* at § 4.5.I.

## CONSTRUCTION OF THE CONDUITS

### The Disputed Conduits[26]

19.    Between 1999 and 2003, TA undertook construction of the six Links. The actual installation of conduit was performed by contractors hired by TA, or in the case of Link 22, hired by Sierra Touch America ("STA").[27]

20.    STA was a joint venture between TA and SPC formed, "in part, to fulfill [TA's] obligations to AT&T pursuant to the [Fiber Optic Agreement]."[28]

21.    The Trustee has alleged 20 Disputed Conduits, which he calls the "Stranded Conduits," are property of the estate, and for which he seeks declaratory relief.

22.    Disputed Conduit number 20 (the "Reno to Spanish Fork Conduits") refers to two conduits on an approximately 574-mile route between Reno, Nevada and Spanish Fork, Utah.

23.    During the NexGen construction, Touch America and its building partners built additional conduits, including any Disputed Conduits, on rights of way other than AT&T's private rights of way.

24.    Some additional conduits were added because the cost or difficulty of a build justified installing additional conduits.

### Financial and Construction Difficulties

25.    TA encountered financial and construction difficulties throughout the build.

26.    The build was delayed beyond the completion dates specified in the Fiber Optic Agreement.[29]

---

[26] References herein to "Disputed Conduits" refer to the purported "Stranded Conduits" described by the Trustee in Exhibit A to the Complaint (Adv. D.I. 245).
[27] The Statement ¶ 21.
[28] SPC Settlement Agreement Recital B.
[29] Fiber Optic Agreement Ex. B

27.     Because of these struggles, AT&T and TA executed Amendment No. 4 to the Fiber Optic Agreement on October 23, 2002, which provided that AT&T would advance monthly payments to TA to facilitate completion.

28.     Under Amendment No. 4, TA granted AT&T a "first priority security interest" in the conduits TA constructed for itself under the Fiber Optic Agreement.[30]

29.     TA failed to complete construction of the Links or fully pay its contractors, who were installing both the six conduits specified by the Fiber Optic Agreement and the additional conduits TA elected to install.[31]

30.     As a result, the contractors and subcontractors (the "Lienholders") filed more than 150 mechanics' liens and related construction claims (the "Lien Claims") "in approximately one dozen states in an aggregate alleged dollar amount in excess of [$30 million] against [Debtors'] and/or against [Debtors'] and AT&T's NexGen Assets."[32]

31.     Several Lienholders filed actions against AT&T and/or TA and its affiliates to enforce their Lien Claims (the "Lien Actions").[33]

<u>Touch America's Settlement of the Sierra Touch America Dispute with SPC</u>

32.     TA encountered additional complications on Link 22, which was being constructed by STA.[34]

33.     At STA's inception, Touch America and SPC each owned a 50% interest in STA.[35]

---

[30] *Id.* Ex. 15 at 3.
[31] AT&T Settlement Agreement at 3.
[32] *Id.* at 2.
[33] *Id.*
[34] SPC Settlement Agreement at 1.
[35] *Id.*

34.    SPC and TA disagreed over how costs and profits should be allocated regarding two additional conduits.

35.    To resolve their disputes, on September 9, 2002, Touch America, SPC and STA entered into the Unit Redemption, Release and Sale Agreement ("URRS"). [36]

36.    The first Whereas Clause of the URRS states: "SPC desires to purchase from STA certain of the telecommunications assets and rights of STA, as described on Exhibit A (the "Assets"), together with all necessary occupancy rights and rights of access to and operation of the Assets (the "Related Rights") in connection with," among other things, "[t]he redemption of the SPC membership interest in STA."[37]

37.    The second Whereas Clause of the URRS defines "First Conduit" as "the First Conduit extending the entire System route from Sacramento, California to Salt Lake City, Utah."[38]

38.    The third Whereas Clause of the URRS states: "each Party to this Agreement acknowledges that SPC has been and is currently negotiating with Qwest Communications Corporation for the sale of the First Conduit to Qwest."[39]

39.    In section II of the URRS, Touch America, SPC and STA agreed to cause SPC to relinquish and abandon its interest in STA by entering into the Redemption Agreement set forth in Appendix A to the URRS.[40]

40.    Touch America and SPC executed the Redemption Agreement on September 9, 2002, pursuant to which Touch America became the sole owner of STA on that date.[41]

---

[36] Sealed App. at A0282-427 (the "URRS"); also attached as Ex. T to the Second Maddox Affidavit; *see* SPC Settlement Agreement Recitals D-E.
[37] URRS at first Whereas Clause.
[38] *Id.* at second Whereas Clause.
[39] *Id.* at third Whereas Clause.
[40] *Id.* § II.
[41] *Id.* Appendix A.

41.     Section V 1 of the URRS is titled "Assets to be Transferred" and provides:

At the Closing, STA shall convey, transfer, and distribute to SPC the following:

    (a)    the First Conduit: and

    (b)    the Reno Metro Conduit: and

    (c)    the Related Rights for (a) and (b) above.

Additionally, at the Closing, STA shall convey, transfer, and distribute to SPC the following assets, by conveying to SPC an indefeasible right of use ("IRU") for the useful life of such assets ("useful life" of an asset is defined in Section 1.13 of the Conduit and Dark Fiber IRU and Sale Agreement, Appendix E):

    (d)    Sixty (60) strands of fiber extending between Sacramento, California and Salt Lake City, Utah

    (e)    Two (2) conduits extending between Reno, Nevada and Spanish Fork, Utah ("IRU Conduits").[42]

42.     Section X 1 of the URRS states that the Conduit and Dark Fiber IRU and Sale Agreement set forth in Appendix E to the URRS ("the SPC IRU Agreement"), "shall govern the Parties' rights and obligations relating to sixty (60) strands of fiber extending from Sacramento, CA to Salt Lake City, UT and two (2) conduits extending from Reno, NV to Spanish Fork, UT."[43]

43.     STA and SPC executed the SPC IRU Agreement on September 9, 2002.[44]

44.     Section 1.7 of the SPC IRU Agreement states that an "Indefeasible Right of Use or IRU means an exclusive right to use SPC's Strands and Conduit."[45]

45.     Section 1.6 of the SPC IRU Agreement states that "SPC Strands means (60) strands, as designated by [STA], of Dark Fiber of the Fiber Optic Facilities."[46]

---

[42] *Id.* § V 1.
[43] *Id.* § X 1. We refer to the latter two conduits as "Reno to Spanish Fork Conduits" or "RSF Conduits" herein.
[44] *Id.* Appendix E (SPC IRU Agreement).
[45] *Id.* Appendix E § 1.7.
[46] *Id.* Appendix E § 1.6.

46.    Section 1.5 of the SPC IRU Agreement states that "SPC Conduit means the (a) one (1) fiber optic conduit installed along the entire Route ("First Conduit") and (b) two (2) additional fiber optic conduits installed along the Route between Reno, Nevada and Spanish Fork, Utah ("IRU Conduit"), as designated by [STA]."[47]

47.    Section 6.1 of the SPC IRU Agreement states "[a]s to the SPC Strands and the IRU Conduit, the Term of this Agreement shall begin on the date first above written and shall end upon the expiration of the Useful Life of the SPC Strands and the IRU Conduits." Useful Life is defined as "the period from the Acceptance Date of SPC's Strands and SPC's Conduit until the date they are no longer capable of producing commercial revenues."[48]

48.    Section 9.1 of the SPC IRU Agreement states that "[l]egal title to the [the 60 fiber strands] and the [Reno to Spanish Fork Conduits] shall at all times be vested in [STA]"[49]

49.    The URRS also "permitted SPC to designate a substitute builder of Link 22 if STA was unable to complete Link 22," and SPC exercised that right when STA failed to do so.[50]

50.    Neither TA nor SPC completed construction of Link 22.[51]

51.    More than 44 Lien Claims, in an aggregate alleged amount in excess of $13 million, were filed by contractors who built Link 22.[52]

---

[47] *Id.* Appendix E § 1.5.
[48] *Id.* Appendix E §§ 6.1 & 1.13.
[49] *Id.* Appendix E § 9.1.
[50] SPC Settlement Agreement Recitals H-K; *see* URRS § VII2.
[51] SPC Settlement Agreement Recital Q.
[52] *Id.*

THE AGREEMENTS AT ISSUE IN THIS ACTION

52.    On June 19, 2003, TA and its affiliates, including STA, filed chapter 11 proceedings in this Court.[53]

53.    The 360 APA, AT&T Settlement Agreement and SPC Settlement Agreement (all defined herein) were entered into during the bankruptcy and approved by this Court.

The 360 Amended and Restated Asset Purchase Agreement

54.    The Debtors and 360 executed an Amended and Restated Asset Purchase Agreement, dated September 10, 2003 (the "360 APA").[54] The Court entered an order (the "Sale Order") approving the 360 APA on the same date.[55] On November 13, 2003, the parties executed Amendment No. 1 to the 360 APA, and the Court approved this amendment on the same day.[56]

55.    Section 2.1 of the 360 APA states that "at the Closing . . . [Debtors] shall sell . . . to [360], all of the Purchased Assets."[57]

56.    The 360 APA defines "Purchased Assets" as "all of [Debtors'] properties, assets, goodwill, rights and claims of whatever kind and nature, real or personal, tangible or intangible, known or unknown, actual or contingent and wherever situated, which are used in, held for use by, or related to in any manner the Relevant Business, but excluding all Excluded Assets, as the same may exist on the Closing Date, including" a list of 12 categories of assets.[58]

---

[53] AT&T Settlement Agreement at 3.
[54] Adv. D.I. 241, Ex. 18.
[55] D.I. 467 (September 10, 2003 Order).
[56] Id. at Ex. F (November 13, 2003 Order).
[57] 360 APA § 2.1.
[58] Id. § 1.1, p. 15.

57.    The 360 APA defines "Relevant Business" as:

> [T]he business operations conducted by [Debtors] on the date of
> this Agreement, relating to the provision of dedicated internet
> services, dial-up internet services, global service provider services,
> private line services (including broadband capacity and transport
> services), dark fiber and conduit leases and 'indefeasible rights of
> use' or any services related to any of the foregoing.[59]

58.    The 360 APA defines "Excluded Assets" as "collectively" 17 categories of assets,

including, among other things:

> (k) all rights and privileges under that certain Unit Redemption,
> Release, and Sale Agreement by and among Touch America, Inc.,
> Sierra Pacific Communications, Inc. and Sierra Touch America
> LLC dated as September 9, 2002; [and]
>
> (p) the NexGen Assets... [60]

59.    The 360 APA defines "NexGen Assets" as:

> [A]ll of the right, title and interest of any of [Debtors] and/or AT&T
> Corp. in and to all of the assets . . . owned, leased or otherwise used
> by any of [Debtors] and/or AT&T in relation to the fiber optic
> network Systems and Routes to be constructed or obtained pursuant
> to the [Fiber Optic Agreement], as amended."[61]

The AT&T Settlement Agreement

60.    AT&T, the Debtors and the Committee executed a Comprehensive Sale,

Interpleader and Settlement Agreement dated as of July 12, 2004 (the "AT&T Settlement

Agreement").[62]

61.    The AT&T Settlement Agreement recitals state that:

> The [Fiber Optic Agreement] recognized that, in addition to the
> fiber optic network segments being constructed for and to be owned
> by AT&T, [TA] would simultaneously be constructing fiber optic

---

[59] *Id.*
[60] *Id.* § 1.1, p. 7-8.
[61] *Id.* § 1.1, p. 13.
[62] Adv. D.I. 241 Ex. 1.

network segments for use and ownership by the Debtors, which would be constructed next to and run parallel with the AT&T segments.[63]

62.    They also state that:

[T]he [Fiber Optic Agreement] also provided that . . . [TA] was permitted to construct and/or obtain for the [Debtors'] use and ownership as many additional conduits as they needed or desired on public rights of way and up to three (3) additional empty conduits on AT&T's private rights of way as part of the [Debtors'] fiber optic network segments.[64]

63.    The above language is not in the Fiber Optic Agreement.

64.    Pursuant to the AT&T Settlement Agreement, AT&T agreed to credit bid its claims against Debtors, and contribute a certain amount into a Special Lien Escrow Fund, which would pay the mechanics' lien claims on the NexGen System.[65]

65.    Section 3.1(a)(ii) of the AT&T Settlement Agreement conveyed from the Debtors to AT&T "all Personal Property," defined as including all . . . Conduit (including the Builder Conduits) . . . owned, leased, used or otherwise possessed by any of the [Debtors] that relate to the NexGen Assets (wherever [located] . . . including but not limited to . . . the personal property set forth on Schedule 4.1.17A."[66]

66.    Schedule 4.1.17A includes "[a]ll . . . Conduit . . . owned by the [Debtors] on any of the Links."[67]

---

[63] AT&T Settlement Agreement recitals.
[64] *Id.*
[65] AT&T Settlement Agreement §§2.1, 2.2.
[66] *Id.* §§ 3.1(a)(ii); 1.1.107.
[67] Schedule 4.1.17A.

67.    Section 1.1.94 of the AT&T Settlement Agreement defines the term "NexGen Assets" used therein as "all of the assets . . . owned, leased or otherwise used by any of the [Debtors] and/or AT&T in relation to the fiber optic network Systems and Routes to be constructed or obtained pursuant to the [Fiber Optic Agreement]."[68]

68.    Section 1.1.21 of the AT&T Settlement Agreement defines the term "Builder Conduits" used therein as "the empty Conduits in the System owned by the [Debtors] located on an AT&T Right of Way, a Builder Right of Way or any other Right of Way."[69]

69.    Section 1.1.138 of the AT&T Settlement Agreement defines the term "System" used therein as:

> [T]he fiber optic telecommunication facility comprised of the AT&T Conduits, the AT&T Fibers, the Builder Conduits, the Builder Fibers, the First Conduit, The Cable, the AT&T Sites and the Builder Sites which were or are to be constructed pursuant to the Fiber Optic Agreement together with all necessary Permits, manholes, handholes, regeneration and optical amplifier huts/buildings and associated items required to utilize the System.[70]

70.    Section 1.1.121 of the AT&T Settlement Agreement defines the term "Route" used therein as:

> [A] selected path between AT&T's and/or the [Debtors]' Points of Presence (POP) locations in Primary and Intermediate Cities, consisting of contiguous land and/or structures for which the rights to access, construct, install, upgrade, replace, operate and maintain the System have been obtained.[71]

71.    Sections 1.1.82-1.1.88 of the AT&T Settlement Agreement defines each "Link" as "the total of the Route and the System constructed on a Route."[72]

---

[68] AT&T Settlement Agreement § 1.1.94.

[69] *Id.* § 1.1.21.

[70] *Id.* § 1.1.138.

[71] *Id.* § 1.1.121.

[72] *Id.* §§ 1.1.82-1.1.88.

72.     Section 3.1(a)(i) of the AT&T Settlement Agreement conveyed from the Debtors to AT&T "the Owned Real Property," defined as "all real property owned by the [Debtors] and used in connection with the Purchased Assets."[73]

73.     Section 3.1(a)(iii) of the AT&T Settlement Agreement conveyed from the Debtors to AT&T "all As-Built Drawings relating to, arising out of or otherwise connected with the Fiber Optic Agreement, the NexGen Assets and/or the System."[74]

74.     Section 3.1(a)(iii) of the AT&T Settlement Agreement conveyed from the Debtors to AT&T "all Permits," defined as the "permits . . . Rights of Way (including the Builder Right of Way and Public ROW(s), easements . . . and associated rights owned or otherwise held by any [Debtor] necessary for or in connection with or related to . . . the Purchased Assets, the System and the NexGen Assets."[75]

75.     Section 3.1(b) of the AT&T Settlement Agreement states that:

> The Purchased Assets shall not include any rights, assets, Contracts, or other property of [Debtors] that are not expressly enumerated in Section 3.1(a), including but not limited to each [Debtor's] right, title or interest in or to any of the following assets and properties (collectively, the 'Excluded Assets').[76]

76.     Section 3.1(b) of the AT&T Settlement Agreement lists 15 categories of assets excluded from the sale, including the Debtors' capital stock and trade names.[77]

77.     Section 3.1(b) does not list any of the Disputed Conduits.[78]

78.     The only conduit listed in Section 3.1(b) of the AT&T Settlement Agreement is the SPC/Qwest Duct."

---

[73] *Id.* §§ 3.1(a)(1); 4.1.18(a).
[74] *Id.* § 3.1(a)(v).
[75] *Id.* §§ 3.1(a)(iii); 1.1.104.
[76] AT&T Settlement Agreement § 3.1(b).
[77] *Id.*
[78] *Id.*

79.    Section 1.1.131 of the AT&T Settlement Agreement defines the term "SPC/Qwest Duct" as "ha[ving] the meaning set forth in the SPC Settlement Agreement.[79]

80.    The AT&T Settlement Agreement contains no retention by, or conveyance to, Debtors of any right to use or enter the real property, any partial interest in the permits, or any license to use the construction documentation.[80]

81.    Section 5.2 of the AT&T Settlement Agreement states that "[Debtors,] AT&T and [SPC] shall enter into an agreement substantially in accordance with the principal terms set forth in the Non-Binding Talking Points dated May 25, 2004 (the 'SPC Settlement Agreement')."[81]

The SPC Settlement Agreement

82.    AT&T, SPC, Debtors and the Committee executed a Settlement Agreement, dated July 28, 2004 (the "SPC Settlement Agreement").[82]

83.    Recital A of the SPC Settlement Agreement states that Touch America and SPC organized:

> "STA for the purpose of constructing a commercial telecommunications system along a route from Sacramento, California to Salt Lake City, Utah consisting of approximately six (6) separate conduits, including one conduit that would contain fiber optic cable (collectively, 'Link 22')."[83]

84.    Recital E of the SPC Settlement Agreement states that:

> [T]o resolve disputes between SPC and TA, SPC, TA and STA... entered into... the 'URRS', that, *inter alia*, provided for (i) the redemption of SPC's entire membership interest in STA; (ii) SPC's purchase of a single empty conduit, all Reno metropolitan area conduits, collocation, right of way, easement and similar rights relating to the purchased conduits, indefeasible rights of use for

---

[79] *Id.* § 1.1.131.
[80] *Id.*
[81] *Id.* § 5.2.
[82] SPC Settlement Agreement.
[83] *Id.* Recital A.

certain fiber on the Sacramento, California to Salt Lake City, Utah route and conduits on a route extending between Reno, Nevada and Spanish Fork, Utah; (iii) SPC's delivery of a $35,000,000 secured promissory note to STA (the "SPC Note"); and (iv) STA's completion of Link 22.[84]

85.    Recital Y of the SPC Settlement Agreement states that:

[A]s part of this settlement, in exchange for the amounts to be paid by SPC toward settlement and resolution of the Mechanics' Lien Claims and completion of construction and installation of Link 22, [Debtors] are willing to release their security interest in the SPC Acquired Assets and to cancel the SPC Note.[85]

86.    Recital Z of the SPC Settlement Agreement states that:

[A]s part of this settlement, the Parties desire to ensure that SPC will sell, transfer, convey and assign back to STA all of SPC's Link 22 "NexGen" related assets and rights, except for the SPC/Qwest Duct and related collocation rights, rights of way, easements and underlying rights related to the SPC/Qwest Duct, so that STA will have all assets and rights necessary for the Companies to comply with the deliveries to AT&T required by the AT&T/TA Settlement.[86]

87.    Section 1.1.44 of the SPC Settlement Agreement states that "Link 22 has the meaning ascribed to it in Recital A," meaning "a commercial telecommunications system along a route from Sacramento, California to Salt Lake City, Utah consisting of approximately six (6) separate conduits, including one conduit that would contain fiber optic cable."[87]

88.    Section 1.1.64 of the SPC Settlement Agreement defines "SPC Acquired Assets" as:

(i) the SPC/Qwest Duct, (ii) an IRU for the useful life of the asset in two (2) additional Conduits in excess of the original six (6) Conduits that relate to Link 22 that extend from Reno, Nevada to Spanish Fork, Utah, (iii) all Reno, Nevada metropolitan area Conduits installed for Link 22, (iv) an IRU for the useful life of the asset in sixty (60) Fibers of the TA Fibers in the Main Cable that

---

[84]  *Id.* Recital E.
[85]  *Id.* Recital Y.
[86]  *Id.* Recital Z.
[87]  *Id.* § 1.1.44; Recital A.

extend the full length of Link 22, (v) one full, equally sized quadrant at each optical amplifier site on the real property on which STA's optical amplifier sites are situated, as well as easements through the remaining quadrants as set forth on Exhibit A (provided that such quadrants specifically do not include land for optical amplifier sites at or near Provo, Utah; Auburn, California; Blue Canyon, California; and Truckee, California), and (vi) collocation, right-of-way, easement and similar rights relating to the items described in items (i) through (v) of this Section 1.1.6[4].[88]

89.    Section 2.2.1 of the SPC Settlement Agreement provides that SPC shall:

Sell, transfer, assign, convey and deliver to STA and STA shall purchase and acquire from SPC, SPC's right, title and interest in and to the following rights, assets and property (collectively, the "SPC Link 22 Assets"), free and clear of all Liens (other than Permitted Encumbrances) and all Liabilities (other than Assumed Liabilities):

(a) all Construction Documentation to the extent that such Construction Documentation is in the possession, custody or control of SPC and/or its agents, including, without limitation, Spectrum;

(b) all Permits, including but not limited to all applications therefor and renewals thereof, to the extent the same are transferable under applicable Legal Requirements;

(c) all prepaid expenses, deposits, prepayments, refunds and credits of or made by SPC as of the Closing Date, in each case pertaining to, connected with or arising out of the SPC Link 22 Assets;

(d) all rights under all Contracts other than the Assigned Contracts, including, but not limited to (i) the right to receive goods and services pursuant to the such Contracts, (ii) the right (the "Warranty Right") to assert claims (including warranty claims), demands, rights of setoff and recoupment and causes of action and to take other rightful actions in respect of breaches, defaults and other violations of such Contracts against any counter party thereunder, and (iii) all security deposits and bonds with respect to such Contracts, provided, however, that with respect to the Spectrum Agreement and any change orders issued thereunder, such rights shall only include the Warranty Right;

---

[88] *Id.* § 1.1.64.

(e) the SPC Fibers;

(f) all Personal Property, including, but not limited to, all express or implied warranties, if any, and licenses existing for the benefit of the SPC from third parties relating to such Personal Property (to the extent transferable under applicable Legal Requirements) and any related claims, credits and rights of recovery with respect to

such Personal Property, but excluding any furniture, furnishings and computers; and

(g) all rights under all Assigned Contracts, including, but not limited to (i) the right to receive goods and services pursuant to such Contracts, (ii) the right to assert claims (including warranty claims), demands, rights of setoff and recoupment and causes of action and to take other rightful actions in respect of breaches, defaults and other violations of such Contracts against any counter party thereunder, and (iii) all security deposits and bonds with respect to such Contracts."[89]

90.    The "Personal Property" referenced in Section 2.2.1(f) of the SPC Settlement Agreement is defined as "all . . . Conduit . . . owned, leased, used or otherwise possessed by SPC or any of its Affiliates that primarily relate to Link 22 (except to the extent related solely to the SPC/Qwest Duct) (wherever located)."[90]

91.    The "Permits" referenced in Section 2.2.1(b) of the SPC Settlement Agreement are defined as "permits . . . Rights of Way, easements . . . and associated rights owned or otherwise held by SPC or any of its Affiliates necessary for or in connection with or related to . . . Link 22."[91]

92.    The "Construction Documentation" referenced in Section 2.2.1(a) is defined as "all As-Built Drawings, documents . . . and record drawings, in each case pertaining to, connected with or arising out of the construction of Link 22."[92]

---

[89] *Id.* at § 2.2.1.
[90] *Id.* §§ 2.2.1(f); 1.1.56.
[91] *Id.* §§ 2.2.1(b); 1.1.53.
[92] *Id.* §§ 2.2.1(a); 1.1.26.

93.     Pursuant to the terms of the SPC Settlement Agreement, SPC retained, among other things, the SPC/Qwest Duct, which was specifically excluded from the conveyance to STA and from the conveyance of conduit to AT&T in the AT&T Settlement Agreement.[93]

94.     Section 1.1.71 of the SPC Settlement Agreement defines "SPC/Qwest Duct" to mean "one of the original six (6) Conduits installed for Link 22."[94]

95.     Section 1.1.72 of the SPC Settlement Agreement defines "SPC Retained IRU Fibers" to mean "two (2) of the sixty (60) Fibers with respect to which, prior to Closing, SPC holds an IRU granted by STA pursuant to the URRS and in which, subject to Section 5.9 of this Agreement, SPC will retain the rights granted by such IRU after the Closing."[95]

96.     Section 5.9 of the SPC Settlement Agreement is entitled "SPC Retained IRU Fibers." Section 5.9 provides:

> 5.9.1 Effective as of the Closing, the IRU delivered to SPC by STA pursuant to the URRS shall be deemed to be amended such that it grants an IRU solely in the SPC Retained IRU Fibers that is non-assignable, non-transferable and for the sole exclusive use and benefit of SPC and its Affiliates."
>
> 5.9.2 AT&T shall notify SPC as soon as practicable after AT&T first lights any Fiber on Link 22. If SPC does not cause the SPC Retained IRU Fibers to become lit Fiber within one hundred eighty (180) days after the date on which AT&T notifies SPC that AT&T has lit Fiber on Link 22, the SPC Retained IRU Fibers shall be deemed to have been abandoned by SPC and all rights under any IRU granting rights in the SPC Retained IRU Fibers shall be terminated without any further action required by SPC or AT&T."[96]

97.     Section 5.2 of the SPC Settlement Agreement states:

> Upon satisfaction of all of its obligations pursuant to this Agreement, including ... (i) the SPC Note shall be deemed satisfied

---

[93] *Id.* §§ 1.1.56, 2.2.1(f); AT&T Settlement Agreement §§ 1.1.107, 3.1(b)(xiii).
[94] SPC Settlement Agreement § 1.1.71.
[95] *Id.* at § 1.1.72.
[96] *Id.* at §5.9.

and cancelled; (ii) the Companies shall release any security interest in the SPC Acquired Assets; and (iii) SPC and the Companies agree that, effective on and as of the Closing Date (without the need for any further action on the part of any Party), the URRS and MOU shall terminate and be of no further force and effect... [97]

98.     The AT&T Settlement Agreement transferred to AT&T all of Debtors' permits, easements, and rights of way relating to the conveyed assets. Unlike SPC for the SPC/Qwest Duct, Debtors retained no partial interests in these underlying rights.[98]

## THE BANKRUPTCY PROCEEDING

99.     In the bankruptcy, AT&T filed secured and unsecured proofs of claim related to Debtors' obligations under the Fiber Optic Agreement.[99]

100.    AT&T possessed a security interest on all NexGen conduit and a blanket lien on all of Debtors' assets related to the NexGen build.

101.    Between July 2003 and July 2004, Touch America's, AT&T's and SPC's respective lawyers and representatives negotiated the AT&T Settlement Agreement and the SPC Settlement Agreement as part of a global settlement of disputes among those parties.[100]

The Liens

102.    "[I]n connection with the performance of Touch America's obligations under the Fiber Optic Agreement, Touch America entered into numerous agreements with various contractors, and some of those contractors entered into agreements with various other contractors (all such contractors being collectively referred to herein as, the "Construction Subcontractors")."[101]

---

[97] SPC Settlement Agreement § 5.2.
[98] *See* AT&T Settlement Agreement; SPC Settlement Agreement.
[99] AT&T Settlement Agreement at 3.
[100] SPC Settlement Agreement Recitals U - BB; AT&T Settlement Agreement 3-4.
[101] AT&T Settlement Agreement at 2.

103.    The global settlement between AT&T, SPC and Debtors involved resolution of the lien claims asserted by Construction Subcontractors against "the [Debtors] and/or against the [Debtors'] and AT&T's NexGen Assets (as defined [in the AT&T Settlement Agreement]) related to the work they allege to have completed or materials they allege to have provided . . . ."[102]

## STANDARD

Rule 56 of the Federal Rules of Civil Procedure, made applicable by Federal Rule of Bankruptcy Procedure 7056 and 9014(c), provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[103] At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.[104]

The moving party bears the burden of establishing the absence of a genuine dispute as to a material fact.[105] When the nonmoving party bears the burden of persuasion at trial, the moving party "may meet its burden . . . by showing that the nonmoving party's evidence is insufficient to carry that burden."[106]

---

[102] *Id.*
[103] Fed. R. Civ. P. 56(a).
[104] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).
[105] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (quoting Fed. R. Civ. P. 56(c)) ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.").
[106] *Foulk v. Donjon Marine Co., Inc.*, 144 F.3d 252, 258 n.5 (3d Cir. 1998) (quoting *Wetzel v. Tucker*, 139 F.3d 380, 383 n.2 (3d Cir. 1998)).

Once the moving party has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts."[107] Summary judgment cannot be avoided by introducing only "a mere scintilla of evidence,"[108] or by relying on "conclusory allegations, improbable inferences and unsupported speculation."[109] "Brash conjecture coupled with earnest hope that something concrete will materialize, is insufficient to block summary judgment."[110]

Substantive law determines which facts are material; only disputes over facts that might affect the outcome of the suit will preclude summary judgment.[111] Moreover, a dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[112] The Court must resolve all doubts and consider the evidence in the light most favorable to the nonmoving party.[113]

This generally means that a motion for summary judgment may be granted in a contract dispute only when the contractual language on which the moving party's case rests is found to be wholly unambiguous and to convey a definite meaning.[114] Ambiguity here is defined in terms of whether a reasonably intelligent person viewing the contract objectively could interpret the

---

[107] *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

[108] *Sarko v. Penn-Del Directory Co.*, 968 F.Supp. 1026, 1031 (E.D. Pa. 1997) (citation omitted), *aff'd* 189 F.3d 464 (3d Cir. 1999).

[109] *J. Geils Band Emp. Benefit Plan v. Smith Barney Shearson, Inc.*, 76 F.3d 1245, 1251 (1st Cir. 1996) (citation omitted).

[110] *Id.* (quoting *Dow v. United Bhd. of Carpenters*, 1 F.3d 56, 58 (1st Cir. 1993)).

[111] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[112] *Id; see also Delta Mills, Inc. v. GMAC Commercial Fin., LLC (In re Delta Mills, Inc.)*, 404 B.R. 95, 105 (Bankr. D. Del. 2009) (holding that an issue is genuine "when reasonable minds could disagree on the result.").

[113] *Anderson*, 477 U.S. at 255 ("[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.").

[114] *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008); *see Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 156–57 (2d Cir. 2000).

language in more than one way.[115] To the extent the moving party's case hinges on ambiguous contract language, summary judgment may be granted only if the ambiguities may be resolved through extrinsic evidence that is itself capable of only one interpretation, or where there is no extrinsic evidence that would support a resolution of these ambiguities in favor of the nonmoving party's case.[116]

## DISCUSSION

The dispute before me is about ownership of the Disputed Conduits. The Trustee contends that the Disputed Conduits belong to the estate because they were not part of the NexGen Assets that the estate conveyed to AT&T under the AT&T Settlement Agreement. AT&T disagrees and contends that the Disputed Conduits were conveyed under the AT&T Settlement Agreement. Zayo contends that if the Trustee is correct that the estate did not transfer the Disputed Conduits to AT&T, then the Disputed Conduits belong to Zayo, not to the estate, pursuant to the 360 APA. The questions presented in this Adversary Proceeding do not turn on fact disputes. Their resolution turns on a reading of the contracts governing the various transfers. Accordingly, I will grant summary judgment in favor of AT&T, and deny all other pending summary judgment motions in this Adversary Proceeding.

## I.   THE UNAMBIGUOUS LANGUAGE OF THE AT&T SETTLEMENT AGREEMENT CONVEYED ALL DISPUTED CONDUITS (1-20) TO AT&T

The FOA and the AT&T Settlement Agreement (collectively, the "Operative Agreements") are both governed by New York law.[117] The FOA was a pre-petition construction agreement in which TA agreed to construct a fiber optic network through parts of the United States

---

[115] *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan,* 7 F.3d 1091, 1095 (2d Cir.1993).
[116] *See Compagnie Financiere,* 232 F.3d at 158.
[117] AT&T Settlement Agreement § 11.4; FOA Art. 27.

(the "NexGen Project").[118] Thereafter, in a Confirmation Order, this Court approved the AT&T

Settlement Agreement whereby TA sold to AT&T the NexGen Assets. The AT&T Settlement

Agreement refers to the FOA throughout, but does not rely exclusively on the definitions

previously written by the parties in the FOA.[119]

## A. The AT&T Settlement Agreement is Unambiguous

The rules of contract interpretation under New York law require that a contract be read

holistically so as to give meaning and effect to each of its parts.[120]

> A contract should be read as a whole to ensure that undue emphasis
> is not placed upon particular words and phrases . . . Courts may not
> by construction add or excise terms, nor distort the meaning of those
> used and thereby make a new contract for the parties under the guise
> of interpreting the writing. . . . [S]pecific clauses of a contract are to
> be read consistently with the over-all manifest purpose of the
> parties' agreement. Contracts are also to be interpreted to avoid
> inconsistencies and to give meaning to all of its terms.[121]

Further, "[i]n a dispute over the meaning of a contract, 'the threshold question is whether

the contract is ambiguous.'"[122] If a contract is unambiguous, the court "should assign the plain and

ordinary meaning to each term and interpret the contract without the aid of extrinsic evidence."[123]

Under the AT&T Settlement Agreement, the Debtors sold to AT&T, among other things:

(i) the NexGen Assets and (ii) Personal Property that relates to the NexGen Assets. AT&T first

urges the Court to accept that the Disputed Conduits are included within the definition of NexGen

Assets, which include, "all of the assets and property ... owned ... by any of the [Debtors] ... in

---

[118] *See* FOA at 1 (Adv. D.I. 233).
[119] *Rosen v. Mega Bloks Inc.,* 2007 WL 1958968, at *10 (S.D.N.Y. July 6, 2007) ("The mere fact that a contract refers to another contract does not mean that it has 'incorporated' the other contract.").
[120] *Schantz v. Marine Midland Bank, N.A.* (*In re Schantz*), 221 B.R. 653, 658 (Bankr. N.D.N.Y. 1998) (citing *deBrossard v. Van Norden,* 495 N.Y.S.2d 369, 372 (N.Y. App. Div. 1985) (citation omitted).
[121] *In re AMR Corp.,* 485 B.R. 279, 289 (Bankr. S.D.N.Y.), *aff'd,* 730 F.3d 88 (2d Cir. 2013).
[122] *Lockhead Martin Corp. v. Retail Holdings, N.V.,* 639 F.3d 63, 69 (2d Cir. 2011).
[123] *Alexander & Alexander Servs. v. These Certain Underwriters at Lloyd's,* 136 F.3d 82, 86 (2d Cir. 1998).

relation to the fiber optic network System and Routes to be constructed or obtained pursuant to the

[FOA]."[124] Alternatively, AT&T argues that if the Court determines that the Disputed Conduits do

not fall within the definition of NexGen Assets, then the Disputed Conduits were nonetheless sold

as Personal Property under the AT&T Settlement Agreement, because they fit within the following

definition:

> [A]ll … Conduit (including the Builder Conduits) … owned, used
> or otherwise possessed by any of the [Debtors] **that relate to the
> NexGen Assets**.[125]

NexGen Assets are defined as:

> [A]ll of the assets … owned, leased or otherwise used by any of the
> [Debtors] and/or AT&T **in relation to the fiber optic network
> Systems and Routes to be constructed or obtained pursuant to
> the [FOA]**."[126]

The Court of Appeals for the Second Circuit has held that "[a]n ambiguity exists where the

terms of a contract could suggest 'more than one meaning when viewed objectively by a

reasonably intelligent person who has examined the context of the entire integrated agreement and

who is cognizant of the customs, practices, usages and terminology as generally understood in the

particular trade or business.'"[127]

The Trustee first argues that whether "the [Disputed] Conduits fall under the 'related to'

clause [in the AT&T Agreement] … is a question of fact."[128] However, New York and other courts

consistently maintain that the term "'related to' … is clear and unambiguous."[129] One court has

---

[124] AT&T Settlement Agreement §§ 1.1.94, 3.1(a)(ii).
[125] *Id.* §§ 1.1.107, 3.1(a)(ii)) (emphasis added).
[126] *Id.* § 1.1.94 (emphasis added).
[127] *Alexander & Alexander Servs,,* 136 F.3d at 86 (quoting *Lightfoot v. Union Carbide Corp.,* 110 F.3d
898, 906 (2d Cir. 1997)).
[128] *See* Trustee Br. at 51 (Adv. D.I. 224).
[129] *Coregis Ins. Co. v. American Health Found.,* 241 F.3d 123, 129 (2d Cir. 2001).

stated that such a provision "constitutes the broadest language the parties could reasonably use."[130]

The Trustee and Zayo suggest other possible meanings of the language used in the Operative

Agreements. However, these arguments are insufficient to create an ambiguity, as the alternative

interpretations are simply not reasonable.[131] A narrow reading of the phrase "related to," directly

contradicts the plain language of the AT&T Settlement Agreement, as well as its purpose.

The Trustee further argues that the AT&T Settlement Agreement is ambiguous because it

did not "expressly enumerate" the Disputed Conduits as Personal Property sold thereunder.[132]

However, the fact that something is not stated explicitly does not mean that the language of the

contract is ambiguous. I do not find the pertinent language to be ambiguous, and will assign the

plain and ordinary meaning to each term and interpret the contracts without the aid of extrinsic

evidence.

**B. The Unambiguous Language of the Operative Agreements, Taken Together, Effectively Conveyed all Disputed Conduits to AT&T.**

The Second Circuit has determined that "the ordinary meaning of the broad term 'related

to' ... is clear and unambiguous."[133] Another court further explained that "a clause using the

language 'related to' is extremely broad," which has since been echoed by various courts.[134]

---

[130] *Fleet Tire Serv. v. Oliver Rubber Co.*, 118 F.3d 619, 621 (8th Cir. 1997); *see also John Wyeth*, 119 F.3d at 1075 (finding "in relation to" unambiguous and, thus, there was "no basis for considering the scant extrinsic evidence" proffered).

[131] *Maxim Group LLC v. Life Partners Holdings, Inc.*, 690 F. Supp. 2d 293, 304 (S.D.N.Y. 2010) ("[A] contractual provision is not rendered ambiguous simply because two interpretations are technically possible; both interpretations must also be reasonable.").

[132] *See* Trustee Br. at 52-53 (Adv. D.I. 224).

[133] *Coregis Ins. Co. v. American Health Found.*, 241 F.3d 123, 129 (2d Cir. 2001) (holding "[t]o 'arise' out of means 'to originate from a specified source,'" while "[t]he term 'related to' is typically defined more broadly and is not necessarily tied to the concept of a causal connection.") *Coregis*, 241 F.3d at 128 (internal citations omitted).

[134] *Kahn v. Am. Heritage Life Ins. Co.*, 324 F. Supp. 2d 652, 655 (E.D. Pa. 2004) (citing *John Wyeth & Bro. Ltd. v. Cigna Int'l Corp.*, 119 F.3d 1070, 1075 (3d Cir. 1997); *see also Collins & Aikman Prods. Co. v. Building Sys.*, 58 F.3d 16, 20 (2d Cir. 1995) (contract provisions including the phrase "relating to" are "the paradigm of a broad clause").

The FOA contemplated the construction of up to six conduits as part of the NexGen System.[135] Specifically, TA agreed to install three conduits for AT&T ("AT&T Conduits"), and TA was permitted to construct up to three additional conduits for itself (the "FOA Builder Conduits") on AT&T's private right of way ("ROW").[136] In addition to the six conduits in the NexGen System, the FOA allowed TA to construct an unlimited number of conduits for itself on a public ROW. TA took the opportunity to construct additional conduits, twenty (20) of which are now considered the Disputed Conduits, and are the subject of this Adversary Proceeding.

Zayo described the issues in this case very clearly: (i) Do the [Disputed] Conduits relate to NexGen Assets? If yes, then TA conveyed them to AT&T under the AT&T Settlement Agreement; (ii) If the [Disputed] Conduits do not relate to NexGen Assets, do they belong to the estate or to Zayo, as the successor to the purchaser of TA's residual telecom assets?[137]

1. **The Purchased Assets in the AT&T Settlement Agreement are not limited to six conduits.**

There are six conduits on the approximately 800-mile Sacramento, California-to-Salt Lake City Route called "Link 22." As previously stated, the AT&T Settlement Agreement conveys to AT&T, "all ... Conduit (**including the Builder Conduits**) ... owned, used or otherwise possessed by any of the [Debtors] that relate to the NexGen Assets."[138] A point of contention in determining whether the Disputed Conduits were sold to AT&T lies in the definition of the term "Builder Conduit," which is defined differently in the FOA and the AT&T Settlement Agreement.

---

[135] FOA §§ 2.2, 2.8, 2.22, 4.5.I.
[136] *Id.* at Seventh Whereas Clause and § 2.8.
[137] Adv. D.I. 268 at 2.
[138] AT&T Settlement Agreement § 3.1 (a)(ii) (emphasis added).

The Trustee has taken the position that only "builder conduit," as defined in the FOA (*i.e.*, "up to three (3)" conduit) – rather than as defined in the AT&T Agreement – was sold to AT&T. This reading would not include the Disputed Conduits in the definition of "builder conduit."

Conversely, AT&T maintains that "builder conduit" was defined differently, and much broader, in the AT&T Settlement Agreement to include all "empty Conduits in the System owned by the Companies located on an AT&T Right of Way, a Builder Right of Way or any other Right of Way."[139] If the parties to the AT&T Settlement Agreement intended to include only up to three conduits in the sale, they would not have subsequently broadened the definition from the FOA to the AT&T Settlement Agreement, which governs the sale. The parties would likely have left the definition unchanged. The "builder conduits" that were sold pursuant to the AT&T Settlement Agreement are determined by the definition provided in AT&T Settlement Agreement, which includes the Disputed Conduits. Even if the Disputed Conduits do not fit within the definition of "builder conduits" as defined in the AT&T Settlement Agreement, the Disputed Conduits still remain outside of the Trustee's grasp if they were "conduits . . . owned. . . by any of the [Debtors] that relate to the NexGen Assets."[140]

## 2. The Disputed Conduits Relate to the NexGen System.

AT&T contends that all of the Disputed Conduits "relate to" the NexGen Assets because they were installed by the same contractor, at the same time, in the same trench, clustered together with and laid "to the same depth, as much as possible, and in the same direction" as the six conduits specified by the FOA. Further, AT&T points out that the AT&T Settlement Agreement confirms that the FOA "recognized that . . . [TA] would simultaneously be constructing fiber optic network

---

[139] AT&T Settlement Agreement § 1.1.21.
[140] AT&T Settlement Agreement § 3.1(a)(ii) and § 1.1.107.

segments for use and ownership by the Debtors, which would be constructed next to and run parallel with the AT&T segments," and TA was authorized under that agreement "to construct and/or obtain for the [Debtors'] use and ownership as many additional conduits as they needed or desired on public rights of way."[141]

AT&T further maintains that the Disputed Conduits would not exist but for TA's entry into the FOA, pursuant to which TA built the NexGen System.[142] Accordingly, AT&T asserts that such a conduit is "related to" because it is "associated with" the FOA and the NexGen Assets.[143] Using this logic, AT&T reasons that the AT&T Settlement Agreement conveyed to AT&T all conduit that would have been owned by Debtors had the build been completed.

On the contrary, the Trustee and Zayo argue that the Disputed Conduits were not on any of the Links and were not used in relation to the Systems and Routes that were installed under the FOA.[144] They maintain that they were separate. Zayo makes this distinction by pointing out that TA installed the Disputed Conduits for its own use, outside of the six conduits governed by the FOA, as a strategic decision in locations that were difficult to access geographically. However, I

---

[141] FOA at 1-2.

[142] The Trustee and Zayo concur with AT&T, but only with respect to Conduits 1-19—not with respect to Disputed Conduit 20. *See* Trustee Br. (Adv. D.I. 224) at 9 ("During the 2000 to 2003 time period, Touch America built Stranded Conduits 1-19 in the ground, and along river crossings, in miscellaneous public locations throughout the United States whenever Touch America was engaged in construction of the NexGen System and believed that it made sense to place extra conduits in the ground at the time in case Touch America ever needed to access the location again."); Zayo Br. at 19-20 (Adv. D. I. 250) ("During Construction of the NexGen System, Touch America ... installed miscellaneous empty conduits along river crossings and at mountain passes that were adjacent to segments of the NexGen System... Touch America took advantage of the presence of its equipment and workers to add conduits in these difficult locations for itself, outside of the System, Links and Routes"). However, both parties attempt to distinguish the RSF Conduits from the rest of the Disputed Conduits (*see* Trustee Br. at 10; Zayo Br. at 19-21).

[143] *See Coregis*, 241 F.3d at 129; *see also Third Party Advantage Admin'rs, Inc. v. J.P. Farley Corp.*, 2006 WL 3445216, *6 (N.D.Tex. Nov. 27, 2006) (finding that tort claims "related to" a certain asset purchase agreement because "it [was] the existence of the asset purchase agreement that gave rise to the possible assertion of the claims alleged").

[144] The Trustee goes to great lengths to argue that the Disputed Conduits were not built pursuant to the FOA, citing deposition testimony and the FOA's terms (*see* Trustee Answering Brief at 17, 19, 23-26).

do not find this argument to be persuasive because the FOA Builder Conduits were owned by TA and still considered part of the NexGen System.

Without weighing any of the extrinsic evidence offered by the parties, the language of the contracts themselves make clear that the Disputed Conduits were contemplated and discussed in the FOA. The purpose of the FOA was to provide for the creation of the NexGen System. Logically, it can only follow that the Disputed Conduits are related to that System.

### 3. The Disputed Conduits are not excluded from the Personal Property conveyed as part of the AT&T Settlement Agreement just because they are not expressly enumerated.

The Trustee maintains that the Disputed Conduits were not included in the sale to AT&T because they were excluded. Section 3.1(a)(ii) of the AT&T Settlement Agreement states that TA sold to AT&T its Personal Property, defined in section 1.1.107 as all personal property that relate to the NexGen Assets.

Excluded Assets are defined in section 3.1(b) of the AT&T Settlement Agreement and include anything that is "not expressly enumerated in Section 3.1(a)…"[145] The Trustee's argument relies on a determination that any conduits in addition to the six conduits built pursuant to the FOA as the NexGen System are not related to the NexGen Assets. As previously discussed, the Disputed Conduits are related to the NexGen Assets and need not be enumerated expressly as such. Therefore, the Disputed Conduits are not excluded under Section 3.1(b).

### 4. The Reno-Spanish Fork Conduits (No. 20)

The Reno to Spanish Fork Conduits ("RSF Conduits") are two additional conduits (both listed as Disputed Conduit No. 20 on the Trustee's list) on an approximately 500-mile route that is adjacent to the six Sacramento-to-Salt Lake City route conduits ("Link 22"). In their briefs, the

---

[145] AT&T Settlement Agreement § 3.1(b)

parties refer separately to the RSF Conduits, which the Trustee claims are the two most valuable of the Disputed Conduits.

Zayo first claims that its predecessor, 360, purchased the RSF Conduits from TA pursuant to the 360 APA. However, the unambiguous language of the 360 APA specifically excluded the RSF Conduits from 360's purchase of TA's assets. Section 2.1 of the 360 APA states that TA sold to 360 all "Purchased Assets."[146] The 360 APA's definition of "Purchased Assets" excludes "Excluded Assets."[147] The 360 APA defines Excluded Assets as the following in paragraph (h):

> (h) all rights and privileges under that certain Unit Redemption, Release and Sale Agreement, by and among Touch America, Inc., Sierra Pacific Communications, Inc. and Sierra Touch America LLC ["STA"] dated as September 9, 2002 [the "URRS"].[148]

Therefore, I must also determine whether TA obtained any "rights and privileges under the URRS" to the RSF Conduits. Section X 1 of the URRS states that the definitive indefeasible right to use ("IRU") agreement in Appendix E to the URRS "shall govern the Parties' rights and obligations relating to the sixty (60) strands of fiber extending from Sacramento, CA to Salt Lake City, UT and two (2) conduits extending from Reno, NV to Spanish Fork, UT." Section 9.1 of the definitive IRU agreement in Appendix E states that "legal title to the IRU Conduit [defined as the Reno to Spanish Fork Conduits] shall at all times be vested in Owner [defined as Touch America affiliate STA]."[149] It follows that the RSF Conduits were not sold to 360 as part of the 360 APA.

Alternatively, Zayo claims that its other predecessor, SPC, purchased the RSF Conduits from TA pursuant to the terms of SPC's 2004 Settlement Agreement with TA and AT&T (the

---

[146] 360 APA at 0530.
[147] *Id.* at 0521.
[148] *Id.* at 0513-14.
[149] SPC IRU Agreement, § 9.1.

"SPC Settlement Agreement").[150] However, the SPC Settlement Agreement did not convey the RSF Conduits to SPC. In fact, the SPC Settlement Agreement specifically terminated SPC's right to use the RSF Conduits.

Initially, the URRS "convey[ed] to SPC an indefeasible right to use ("IRU"). . . Sixty (60) strands of fiber extending between Sacramento, California and Salt Lake City, Utah [and] Two (2) conduits extending between Reno, Nevada and Spanish Fork, Utah."[151] Thereafter, the SPC Settlement Agreement was entered into and states that "the IRU delivered to SPC by STA pursuant to the URRS shall be deemed amended such that it grants an IRU **solely** in the SPC Retained IRU Fibers [defined as two of the 60 fibers on the Sacramento to Salt Lake City route that SPC obtained in the URRS]."[152] Therefore, not only were the RSF Conduits not conveyed to SPC as part of the SPC Settlement Agreement, but the SPC Settlement Agreement actually terminated SPC's IRU in the RSF Conduits altogether.

Zayo further claims that by Quitclaim Deed dated June 24, 2015, Zayo acquired any and all of SPC's rights in the Disputed Conduits. As such, Zayo makes a blanket statement that "SPC was the owner of the Reno to Spanish Fork conduits." However, even accepting that Zayo acquired SPC's rights, the contracts discussed *supra* make clear that SPC did not have any rights in the Disputed Conduits to quitclaim to Zayo.

AT&T asserts that the RSF Conduits are even more clearly "related to" the FOA (as compared to Disputed Conduits 1-19) and argues that the Debtors agreed in the SPC Agreement

---

[150] Zayo Answering Brief at 22 (Adv. D.I. 250). Zayo argues that the SPC Agreement does not release SPC's IRU in the RSF Conduits because such conduits were "not referenced in [Section 5.9.1] or even generally in the [Section 5.9] heading." Section 5.9 is titled, "SPC Retained IRU Fibers" and Section 5.9.1 states:
> [T]he IRU delivered to SPC by STA pursuant to the URRS shall be deemed to be amended such that it grants an IRU solely in the SPC Retained IRU Fibers ...

[151] URRS § V 1.
[152] SPC Settlement Agreement § 5.9.1 (emphasis added).

that the RSF Conduits "relate to Link 22."[153] Since Link 22 is part of the NexGen Assets, the RSF Conduits located in Link 22 must be related to the NexGen System. Further, AT&T emphasizes that such conduits also were required to be built in connection with the NexGen build by the Nevada DOT for TA to obtain necessary rights of way.[154] For these reasons, AT&T concludes that the RSF Conduits are "related to" the FOA, and are therefore, related to the NexGen System.

On the contrary, the Trustee argues that the RSF Conduits are especially <u>not</u> related to the NexGen Assets by distinguishing the way that TA obtained the RSF Conduits, compared to the rest of the Disputed Conduits discussed *supra*. TA became the owner of the RSF Conduits pursuant to the SPC Settlement Agreement. The Trustee makes various arguments asserting that the agreements in dispute in this litigation "carve-out" the RSF Conduits based upon their terms. In support of these contentions, the Trustee submits an extensive amount of extrinsic evidence.[155] I find the terms of the SPC Settlement Agreement, as well as the other agreements at issue, to be unambiguous. Accordingly, I will not consider the extrinsic evidence introduced by any of the parties.

The controlling language and explicit definitions are as follows: Section 3.1 (a) of the AT&T Settlement Agreement states that TA agreed to transfer to AT&T "certain of the SPC Link

---

[153] SPC Agreement § 1.1.64 (describing "two (2) additional Conduits in excess of the original six (6) Conduits *that relate to Link 22* that extend from Reno, Nevada to Spanish Fork, Utah") (emphasis added). In addition, AT&T asserts that the FOA explicitly states that the "[c]onduits required by permitted agencies" were – or, at a minimum, were related to – Builder Conduit. (*See* Ex. 3 § 4.5.1 ("Builder shall notify AT&T of any changes in Builder Conduit requirements from those designated in Exhibit B prior to construction. *This would include Conduits required by permitting agencies.*") (emphasis added)).

[154] *See* AT&T Opening Brief at 9.

[155] The Trustee relies on certain extrinsic evidence in an effort to establish that TA and AT&T agreed that the NexGen Assets consisted of only the six conduits that Touch America constructed pursuant to the FOA, and "not seven or eight conduits that do not connect to the AT&T terminals." Adv. D.I. 224 at 54. The evidence offered consists of emails, communication, deposition testimony, previous contract drafts, and negotiations between the parties.

22 Assets."[156] Section 1.1.129 of the AT&T Settlement Agreement says that SPC Link 22 Assets has the meaning set forth in the SPC Settlement Agreement. The SPC Settlement Agreement defined "SPC Link 22 Assets," as all "Personal Property," defined to include "all Conduits…that relate primarily to Link 22." Recital A of the SPC Settlement Agreement defines "Link 22" as the system along the Sacramento to Salt Lake City route consisting of 6 conduits. Regardless of the manner in which TA came into possession of the RSF Conduits, the RSF Conduits are still clearly related to Link 22, which is part of the NexGen System.

Therefore, I find that the Disputed Conduits, including the RSF Conduits, are conduits "that relate to the NexGen Assets" and, consequently, were conveyed to AT&T.[157] Accordingly, I will grant AT&T's motion for summary judgment and deny the other motions before me. An appropriate order follows.

BY THE COURT:

_____
KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

Dated: April 25, 2017

---

[156] AT&T Settlement Agreement § 3.1(a).
[157] AT&T Settlement Agreement §§ 1.1.107, 3.1(a)(ii).